Peter L. Carr, IV (SBN 256104)
pcarr@thePLClawgroup.com
Na'Shaun L. Neal (SBN 284280)
nneal@thePLClawgroup.com
Lauren K. McRae (SBN 331296)
lmcrae@thePLClawgroup.com
**PLC LAW GROUP, APC**
3756 Santa Rosalia Dr., Suite 326
Los Angeles, CA 90008
Telephone: (310) 400-5890
Facsimile: (310) 400-5895
Attorneys for Plaintiff Jose Gutierrez

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOSE GUTIERREZ,<br><br>Plaintiff,<br>vs.<br><br>COUNTY OF LOS ANGELES; DEPUTY EUGENE CONTRERAS (#516515); DEPUTY ERIC MORENO (#472731) and DOES 1 through 10 inclusive,<br><br>Defendants. | Case No.<br><br>**PLAINTIFF'S COMPLAINT FOR DAMAGES**<br><br>1. Excessive Force (42 U.S.C. § 1983)<br>2. Substantive Due Process (42 U.S.C. § 1983)<br>3. Custom, Practice or Policy Causing Violation of Civil Rights (42 U.S.C. § 1983) |

Plaintiff JOSE GUTIERREZ complains of Defendants COUNTY OF LOS ANGELES, DEPUTY EUGENE CONTRERAS, DEPUTY ERIC MORENO and DOES 1 through 10 inclusive, as follows:

**JURISIDICTION AND VENUE**

1. This Court has original jurisdiction under 28 U.S.C. §§ 1331, 1343 (a)(3)-(4) because Plaintiff asserts claims arising under the laws of the United States that



include 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution.

2. This court has supplemental jurisdiction over Plaintiff's claims arising under state law pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy under the Article III of the United States Constitution.

3. The venue is proper in the Central District of California pursuant to 28 U.S.C. §§ 1391(b) and (e). This court is proper because Defendants reside in this district and the unlawful actions challenged occurred in this district.

**STATUTORY TOLLING**

4. The subject incident occurred on March 31, 2019 while Plaintiff was a minor. Accordingly, the statute of limitations for Plaintiff's claims was tolled until Plaintiff reached the age of majority on April 18, 2019, pursuant to California Code of Civil Procedure 352(a). In addition, under California Rules of Court Appendix I Emergency Rule 9(a), the statute of limitations for Plaintiff's claims was tolled from April 6, 2020 until October 1, 2020. Accordingly, the statute of limitations for Plaintiff's claims runs October 18, 2021. As such, Plaintiff's instant complaint is timely.

**PARTIES**

5. At all relevant times herein, JOSE GUTIERREZ was an individual residing in the City of Los Angeles, County of Los Angeles, California.

6. At all relevant times herein, the Los Angeles Sheriff's Department ("LASD") was a department of the Defendant COUNTY OF LOS ANGELES ("COLA"), a public entity duly organized and existing under the laws of the State of California, and was responsible for the hiring, retaining, training and supervision of the conduct, policies and practices of its employees and agents of the LASD and all of its members, agents and employees.

7. DEPUTY EUGENE CONTRERAS is, and at all times in this complaint was,



an individual employed by COLA and/or its subsidiaries as LASD deputy, acting with the course and scope of his employment and also within his actual and apparent authority as an office of a public entity, COLA.

8. DEPUTY ERIC MORENO is, and at all times in this complaint was, an individual employed by COLA and/or its subsidiaries as LASD deputy, acting with the course and scope of his employment and also within his actual and apparent authority as an office of a public entity, COLA.

9. At all relevant times, Defendant DOES 1-10 ("DOE Deputies"), individually and as a peace officers, were duly authorized employees and agents of COLA, who were acting under color of law, within the course and scope of their respective duties as police officers and within the complete authority and ratification of their principal, Defendant COLA.

10. In doing the acts and failing and omitting to act as hereinafter described, Defendants, individually and as peace officers, were acting on the implied and actual permission and consent of the COLA.

11. At all times mentioned herein, each and every COLA defendant was the agent of each and every other COLA defendant and had the legal duty to oversee and supervise the hiring, conduct and employment of each and every COLA defendant.

12. Plaintiff is unaware of the true names and capacities of those Defendants named herein as DOES 1-10. Plaintiff is informed and believes, and thereon alleges that these DOES 1-10 are legally responsible and liable for the incident, injuries, and damages hereinafter set forth, and that each of said Defendants proximately caused the injuries and damages by reason of negligent, careless, deliberately indifferent, intentional, willful and wanton misconduct, including creating and otherwise causing the incidents, conditions, and circumstances hereinafter set forth, or by reason of direct or imputed negligence or vicarious fault or breach of duty arising out of the matters herein alleged. Plaintiff will amend this Complaint to set forth said true names and identities of the unknown named DOE Defendants when



they are ascertained.

## FACTS COMMON TO ALL COUNTS

13. Plaintiff repeats, realleges, and incorporates by reference paragraphs 1-11 as though set forth in full herein.

14. On or about March 31, 2019 at approximately 10:45 p.m., seventeen-year-old Latino Plaintiff Mr. Gutierrez was walking with his friend down West Alondra Blvd. towards South Center Avenue in Compton, California. As they were walking, Mr. Gutierrez' friend told him that a patrol car pulled up behind them.

15. Mr. Gutierrez, who was in possession of a handgun, began running away from the patrol car.

16. Seconds later, Deputies Eric Moreno and Eugene Contreras shot Mr. Gutierrez several times from behind, causing Mr. Gutierrez severe and potentially permanent injuries.

17. Mr. Gutierrez did not make any furtive movements before he was shot. Also, Mr. Gutierrez did not point the gun at the deputies or anyone else prior to being shot by the deputies.

18. Deputies Contreras and Moreno did not give Mr. Gutierrez any warning or command before shooting at him from behind.

19. As a result of the shooting, Mr. Gutierrez sustained four gunshot wounds in his buttocks, one gunshot wound in left arm, two gunshot wounds in the left side of his torso and one gunshot wound in his left hip area. Additionally, Mr. Gutierrez' left calf was grazed by a bullet during the shooting.

20. Following the incident, Mr. Gutierrez was taken in an ambulance to St. Francis Hospital for treatment. Mr. Gutierrez remained hospitalized for approximately two weeks.

///

///

///



**FIRST CAUSE OF ACTION**

**Excessive Force (42 U.S.C. § 1983)**

**(Plaintiff against Defendant Deputies Eugene Contreras, Eric Moreno and Defendant DOES 1-10, inclusive)**

21. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

22. Defendant Deputies Contreras and Moreno, individually and as peace officers, unjustified shooting deprived Plaintiff of his right to be secure in his person against unreasonable seizures as guaranteed to Plaintiff under the Fourth Amendment of the United States Constitution and applied to state actors by the Fourteenth Amendment.

23. Both prior to and during the time in which the Defendant Deputies Contreras and Moreno shot and injured Plaintiff, Plaintiff posed no reasonable threat of imminent violence or danger to the Defendant Deputies or to any other individual, as he was running in the opposite direction of the deputies with his back turned to them, did not make any furtive movements and did not point the gun at anyone.

24. As a result of Defendant Contreras and Moreno's use of excessive force, Plaintiff suffered economic damages, as well as mental anguish, emotional distress, extreme pain, soreness, discomfort, insomnia, cold sweats, stress, anxiety, depression, stiffness and muscle spasms.

25. As a result of the conduct of Defendant Deputies Contreras and Moreno, individually and as peace officers, they are liable for Plaintiff's injuries, either because they were integral participants in the excessive force, or because they failed to intervene to prevent these violations.

26. The conduct of Defendant Deputies was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff and therefore warrants the imposition of exemplary and punitive damages as to Defendant Deputies,



individually.

27. Plaintiff also seeks attorney fees under this claim pursuant to 42 U.S.C. § 1988.

**SECOND CAUSE OF ACTION**

**Substantive Due Process (42 U.S.C. § 1983)**

**(Plaintiff against Defendant Deputies Eugene Contreras, Eric Moreno and Defendant DOES 1-10, inclusive)**

28. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

29. Plaintiff has a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive him of life, liberty, or property in such a manner as to shock the conscious, including but not limited to, Defendant Deputies Contreras' and Moreno's unwarranted firing of several shots at Plaintiff.

30. The aforementioned actions of Defendant Deputies Contreras and Moreno, individually and as peace officers, along with other undiscovered conduct, shook the conscious, in that they acted with deliberate indifference to the constitutional rights of Plaintiff, and with purpose to harm unrelated to any legitimate law enforcement objective.

31. As a direct and proximate cause of the shooting by Defendant Deputies, individually and as peace officers, Plaintiff suffered economic damages, as well as mental anguish, emotional distress, extreme pain, soreness, discomfort, insomnia, cold sweats, stress, anxiety, depression, stiffness and muscle spasms, for which he is entitled to recover damages.

32. The conduct of Defendant Deputies, individually and as peace officers, was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff and therefore warrants the imposition of exemplary and punitive



damages as to Defendant Deputies, individually.

33. Plaintiff also seeks attorney fees under this claim pursuant to 42 U.S.C. § 1988.

**THIRD CAUSE OF ACTION**

**Custom, Practice or Policy Causing Violation of Civil Rights (42 U.S.C. § 1983)**

**(Plaintiff against Defendant COLA)**

34. Plaintiff incorporates by reference each and every allegation and fact contained in the preceding paragraphs of this complaint as though fully set forth herein.

35. Defendant COLA is, and at all times herein mentioned has been, a public entity and an incorporated municipality duly authorized and existing as such in and under the laws of the State of California and at all times herein mentioned, Defendant COLA possessed the power and authority to adopt policies and prescribe rules, regulations and practices affecting the operation of the LASD and its tactics, methods practices, customs and usages.

36. At all times herein mentioned, Defendant Deputies and each of them, were employees acting under the COLA's direction and control, who knowingly and intentionally promulgated, maintained, applied and enforced the continuation of policies, customs, practices and usages in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Said customs, policies, practices and usages at all times herein mentioned required and encouraged the employment, deployment and retention of persons as peace officers, who have demonstrated their brutality, dishonesty, and numerous other serious abuses of their powers as peace deputies for the COLA.

37. The unconstitutional policies, practices or customs promulgated, sanctioned or tolerated by Defendant COLA and LASD include, but are not limited to:

a. Defendant COLA and LASD tacitly condones and encourages use of excessive force against citizens, including shooting suspects from behind during foot pursuits;







b. Defendant COLA and LASD had knowledge, prior to and since this incident, of similar allegations of wrongful and unlawful battery, dishonesty and improper tactics, and corruption by LASD employees, including the individual Defendants herein, and refused, with deliberate indifference, to enforce established administrative procedures to ensure public safety and the protection of citizens' rights, including Plaintiff;

c. Defendant COLA and LASD refused to adequately discipline individual employees found to have committed similar acts of misconduct as alleged in this Complaint;

d. Defendant COLA and LASD refused to competently and impartially investigate allegations of abuse and misconduct alleged to have been committed by COLA and LASD employees;

e. Defendant COLA and LASD reprimanded, threatened, intimidated, demoted and fired employees who reported acts of abuse by other COLA and LASD employees;

f. Defendant COLA and LASD failed to adequately supervise the actions of employees under its control;

g. Defendant COLA and LASD tacitly condones and encourages a conspiracy of silence among its employees for the purpose of concealing and furthering wrongful and illegal conduct;

h. Defendant COLA and LASD's tacitly condones and encourages unlawful mistreatment and criminalization of Hispanic males;

i. Defendant COLA and LASD knew of the existence of deputy gangs who violate the civil rights of residents in Los Angeles County prior to the shooting of Mr. Gutierrez. COLA and LASD officials have failed to investigate or reprimand deputy gangs/cliques, which has allowed these gangs/cliques to thrive within LASD; and

j. Defendant COLA and LASD maintain a list of deputies who have



engaged in misconduct ("Brady List") and have refused to produce the list despite receiving various court orders to do so in various cases. Defendant COLA and LASD's refusal to produce the Brady List emboldens deputies who engage in misconduct as they know that they know that their wrong acts will not be shared with the public.

38. The following list exemplifies the aforementioned policies, customs, practices and usages of Defendants COLA and LASD:

a. The LASD has a history of deputy misconduct. An 86-page report by the Los Angeles County Office of Independent Review detailed allegations against LASD deputies of false police reports and lies about uses of force in its eleventh annual review.[1]

b. The United States Department of Justice has also found that the LASD has a history and practice of misconduct that has led to grand deprivation of constitutional rights. On April 28, 2015, the LASD and the U.S. Department of Justice entered a settlement regarding allegations of long-standing civil rights abuses. The U.S. Department of Justice discovered the LASD violated the U.S. Constitution by conducting unconstitutional stops, searches, seizures and excessive force against minority communities.[2]

c. In February 2021, the County of Los Angeles Office of Inspector General published "Los Angeles County Sheriff's Department: Review and Analysis of Misconduct Investigations and Disciplinary Process"[3]. Said publication confirms the following:

i. LASD policy places no affirmative duty on department

---

[1] Sarah Favot, *Los Angeles Sheriff's Department annual review finds sex, lies and videotape*, WHITTIER DAILY NEWS, Jan. 23, 2014.

[2] Olivia Harris, *Los Angeles County Sheriff Department Makes Long-Standing Civil Rights Settlement*, STOCK WATCH, Apr. 29, 2015.

[3] County of Los Angeles Office of Inspector General published "Los Angeles County Sheriff's Department: Review and Analysis of Misconduct Investigations and Disciplinary Process (February 2021), https://oig.lacounty.gov/Portals/OIG/Reports/IIPublicReport_Body.pdf?ver=lLcShzwX4E2s_NB5lqlGQw%3d%3d







members to report employee misconduct to the employee's unit commander.[4] This failure allows misconduct to run rampant throughout LASD.

ii. Similarly, LASD policy allows the Internal Affairs Bureau to disregard misconduct of employees who are not explicitly identified in their request.[5] This failure gives the illusion of internal oversight but allows misconduct to go unchecked.

iii. There exists a code of silence within the LASD that places significant pressure on unit commanders not to initiate internal investigations of employee misconduct. Once an internal investigation has commenced, there is a code of silence where deputies refrain from cooperating with investigations into misconduct of fellow deputies. "Deputies are required by written policy to cooperate with investigations; however, it is the [LASD]'s practice to allow deputies to decline to provide information in investigations of their fellow deputies."[6]

d. On February 12, 2021, LASD deputies shot and injured a man during a foot chase in Norwalk. The man was being pursued for allegedly driving under the influence. The man pulled over, got out of his vehicle and began running away from the deputies. Deputies chased after the man, and during the foot pursuit at least one deputy shot him.

e. On or about October 16, 2020, Fred Williams III was fatally shot from behind by an LASD deputy in the Willowbrook area, after being chased by the deputy down a driveway and into a backyard

---

[4] *Id.*
[5] *Id.*
[6] *Id.*





while armed with a handgun. During the incident, the deputy broadcasted that Williams pointed a gun at him. However, the deputy's body camera footage reveals Williams never pointed a gun at him.

f. In June 2020, an LASD deputy fatally shot Andrea Guardado in his back during a foot pursuit in Gardena. The involved deputies have said they pursued Guardado after he produced a handgun, looked toward the deputies and ran from them.

g. In August 2020, LASD deputies tried to stop Dijon Kizzee, who was riding a bicycle, for traffic violations. When the deputies approached Kizzee, he got off the bicycle and ran. When the deputies caught up to Kizzee, he punched one of the deputies and dropped some clothing he was carrying. At that point, the deputies saw a pistol in the dropped items, and both deputies began shooting Kizzee. The deputies shot at Kizzee 19 times, 15 of which struck Kizzee. Seven of the shots fired by deputies struck Kizzee on his back side.

h. In 2015, LASD deputies fatally shot Nicholas Robertson in his back in Lynwood. The deputies responded to the scene after receiving calls about a man with a gun and shots fired. The deputies approached Robertson and told him to drop the gun. Cell phone video shows deputies firing a volley of shots at Roberson, first as he walks away from them and moments later as he is crawling on the ground.

i. On or about June 24, 2014, LASD Deputies Timothy Lee and Gregory Rodriguez shot and killed Antoine Hunter and severely wounded Geremy Evans. Hunter and Evans were in a vehicle that had come to a stop when the deputies poured shots into the vehicle.



Hunter and Evans posed no reasonable threat of death or serious bodily harm when the deputies shot them. COLA and LASD knew Gregory Rodriguez was a member of a sheriff's gang and that he had LASD gang tattoos prior to this incident. Deputy Gregory Rodriguez aka "G-Rod" is one of the deputies named in government claims filed by fellow deputies regarding a beating of deputies from the East LA Station that took place in September 2018.

j. On or about May 2013, a LASD deputy shot and killed Rigoberto Arceo. LASD Deputy L. Mendoza ordered Arceo to the ground. Rigoberto, with his hands raised in the air, was telling Deputy Mendoza that he did not have to do anything, when the deputy shot him once in the chest. In order to try and justify the shooting, Deputy Mendoza claimed that Arceo was trying to grab his gun. However, independent percipient witnesses who saw the shooting, described Arceo as having his hands raised over his head when he was shot and that he was approximately 10 feet away from the deputy when the deputy shot and killed him.

k. On or about October 10, 2010, a LASD deputy shot and killed Johnathan Cuevas. The deputy stopped next to men walking, without reasonable suspicion to believe they had committed a crime, or probable cause to arrest them. Cuevas ran and fell. Then the deputy shot Cuevas, as he was on the ground.

l. On or about September 14, 2009, an LASD deputy chased Darrick Collins up his driveway and into his own backyard in West Athens, believing he was a robbery suspect. The deputy fired at Collins through wooden gate, fatally hitting him in the back of the neck.

m. Los Angeles Times reported the LASD continues to fail in properly investigating their deputies for deputy gang groups. The LASD



continues to face criticism over gang-like deputy groups and their failure to root out the agency's subculture of tattooed deputy gangs.[7]

n. In a wrongful death suit, Judge Michael P. Vicencia highlighted the concern of the deputy gangs by ruling that the LASD must reveal the names of deputies who have matching skull tattoos. There was a concern that cliques within the LASD promote excessive force.[8]

o. The LASD has a history of retaining deputies that have a known history of misconduct. The Los Angeles Times discovered a secret LASD list that includes 300 deputies with a history of dishonesty and misconduct.[9]

p. LASD Sheriff Alex Villanueva currently faces criticism for the re-hiring of a deputy who has a history of misconduct allegations, is regarded as a member of a deputy gang called the Reapers and has admitted to having a tattoo that represents his membership in said deputy gang.[10]

q. In October of 2020, the L.A. County Inspector General accused L.A. County Sheriff Alex Villanueva of promoting a "code of silence" around the secret deputy gangs within his department.[11] The 2012 Report on the Citizen's Commission of Jail Violence, noted that "for years management has known about and condoned

---

[7] Maya Lau, *L.A. County Sheriff's Department Pays Price as Clandestine Deputy Cliques Persis*t, LOS ANGELES TIME (Oct. 27, 2018, 5:00 AM), https://www.latimes.com/local/lanow/la-me-sheriff-tattoo-liability-20181027-story.html.

[8] Maya Lau and Nicole Santa Cruz, *Wanting to Know About Deputies' Ink; Judge Says Sheriff's Officials Must Reveal If They Know Names of the Deputies with Matching Skull Tattoos*, LOS ANGELES TIMES, Oct. 26, 2018.

[9] Maya Lau, Ben Poston, and Corina Knoll, *A Times Investigation; A Secret List of Deputy Misconduct*, LOS ANGELES TIMES, Dec. 10, 2017.

[10] Maya Lau and Matt Stiles, *Rehired Deputy Admitted Having Tattoo; Swirling Misconduct Allegations and Claims of Secret Societies Put Sheriff Under Scrutiny Over Reinstatement*, LOS ANGELES TIMES, Mar. 29, 2019.

[11] Office of Inspector General County of Los Angeles. (October 2020). *Analysis of the Criminal Investigation of Alleged Assault by Banditos*. Retrieved from https://oig.lacounty.gov/Portals/OIG/Reports/Review_Banditos_Investigation.pdf?ver=qKWrMZe26J3u6iyZ1Sxd2g%3d%3d



deputy cliques and their destructive subcultures that have undermined the Core Values articulate[d] by the Sheriff."[12]

r. The Executioners is a LASD deputy gang/clique dominating the Compton station. Executioners members share a common tattoo of a skeleton wearing a Nazi helmet with the letters CPT. The skeleton holds a rifle marked with the Roman numeral for 28, surrounded by flames. The tattoos are allegedly awarded for killing a civilian, and given out at parties. Recruits are reportedly chosen for the gang based on their propensity for violence against members of the community.[13]

s. In June 2020, LASD Deputy Austreberto "Art" Gonzalez filed a Claim for Damages with the COLA for retaliation. [14] At the time of filing his claim, Deputy Gonzalez had been a deputy at the Compton ("CPT") station for over five years. Deputy Gonzalez' claim details how The Executioners control the Compton station. The claim states, "The Executioners operate at CPT with impunity, its members using violence against other Deputies and members of the public in order to increase their standing the criminal organization. The Executioners recruit members at CPT based upon the prospect's use of violence against suspects or other Deputies. Nearly all the CPT Deputies who have been involved in high-profile shootings and out-of-policy beatings at CPT in recent years have been 'inked' members of The Executioners. 'Inking' refers to the act of each

---

[12] Citizens' Commission on Jail Violence. (2012). *Report of the Citizens' Commission on Jail Violence Executive Summary*. Retrieved from https://ccjv.lacounty.gov/wp-content/uploads/2012/09/CCJV-Executive-Summary.pdf

[13] Los Angeles Times. (2020, July 30). *L.A. County deputy alleges 'executioner' gang dominates Compton Sheriff Station*. Los Angeles Times. Retrieved October 13, 2021, from https://www.latimes.com/california/story/2020-07-30/sheriff-clique-compton-station-executioners.

[14] *Gonzalez Claim for Damages* . (n.d.). Retrieved October 13, 2021, from https://knock-la.com/wp-content/uploads/2021/03/Art-Gonzalez-Executioners-Complaint.pdf.



newly made members of The Executioners receiving a matching tattoo indicating membership in the organization…Members become inked as 'Executioners' after *executing* members of the public, or otherwise committing acts of violence in furtherance of the gang…Of approximately 100 patrol Deputies at CPT, an estimated 20 are inked members of The Executioners, with another 20 being considered 'prospects'…" **Deputy Gonzalez' claim declares Defendant Deputy Eugene Contreras is an inked member of The Executioners**. The claim further states that after Deputy Contreras returned to CPT after a temporary assignment at the Internal Affairs Bureau ("IAB"), Contreras engaged in "extremely aggressive, bullying behavior towards other Deputies with the intent of raining his standing within the gang…In February 2020, Contreras, now a [Field Training Officer], threatened fellow FTO Deputy Thomas Banuelos with violence. This led to an altercation in which Contreras assaulted Banuelos on-duty. This assault was intended to further the reputation of the gang at CPT. On February 8, 2020, Banuelos texted Claimant, who was another fellow FTO, and informed him of Contreras' violent conduct…A few days later, Claimant fulfilled his obligation to report this violent incident anonymously to IAB. As Claimant would later learn, there was nothing confidential about this report, as The Executioners gang had infiltrated IAB and would later obtain a recording of his voice making the 'anonymous' phone call to IAB. Within two days of the anonymous call, inked members of The Executioners already knew it was Claimant who made the call. While at a Patrol School training, Claimant was mortified when Deputy Alcala informed him that '[The Executioners] are saying that it was you who called IA,





and they can't wait to get their hands on the voice print of the call.' Claimant immediately realized that as Contreras had previously worked at IAB, that a former co-worker at IAB had illegally warned Contreras of the complaint. This put Claimant at severe risk of violent reprisal by the gang…" So, Deputy Gonzalez took time off work. As Deputy Gonzalez was on leave, Deputy Alcala texted Gonzalez a photo of graffiti at the station that read, "ART IS A RAT". The retaliation against Gonzalez continued. The inked deputy in dispatch began a pattern of slamming Gonzalez with excessive calls for service, and no other deputy at CPT would partner with him. Gonzalez was constructively demoted, denied overtime pay and forced to either transfer to another assignment or switch from day shift when Contreras began working day shifts.

39. On information and belief, Defendant Deputies Contreras and Moreno attended training programs related to anti-discrimination prior to the incident with Plaintiff.

40. On information and belief, Defendant Deputies Contreras and Moreno attended training programs related to use of force prior to the incident with Plaintiff.

41. Despite Defendant Deputies Contreras and Moreno receiving training that was designed to prevent the conduct described in this Complaint, Defendant Deputies violated Plaintiff's constitutional rights as described in this Complaint.

42. Prior to the incident, COLA knew that its training program was insufficient to prevent the type of civil rights violations Plaintiff suffered but did nothing to prevent said misconduct.

43. The aforesaid policies, customs, practices and usages described in this Complaint were the moving force that caused Plaintiff to be subjected to the unconstitutional acts of Defendant Deputies on March 31, 2019.

44. By reason of the aforesaid policies, customs, practices and usages, Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution



were violated.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests relief as hereinafter provided.

1. For compensatory (or general) damages in an amount to be proven at trial;
2. For punitive damages against the individual defendants in an amount to be proven at trial;
3. For prejudgment interest;
4. For an award of special damages in the amount to be proven at trial;
5. For reasonable costs of this suit incurred herein;
6. For reasonable attorney's fees pursuant to and costs as provided by law;
7. For such further other relief as the Court may deem just, proper and appropriate.

Dated: October 17, 2021

**PLC LAW GROUP, APC**

*/s/ Lauren K. McRae*
Peter L. Carr, IV
Na'Shaun L. Neal
Lauren K. McRae
Attorneys for Plaintiff Jose Gutierrez

**DEMAND FOR JURY TRIAL**

Plaintiff hereby respectfully demands a trial by jury on all issues and claims.

Dated: October 17, 2021

**PLC LAW GROUP, APC**

*/s/ Lauren K. McRae*
Peter L. Carr, IV
Na'Shaun L. Neal
Lauren K. McRae
Attorneys for Plaintiff Jose Gutierrez

